## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THE CHEFS' WAREHOUSE, INC.,<br><br>     Plaintiff,<br><br>  vs.<br><br>LOCAL UNION 1430, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS AFL-CIO, and DYLAN WILEY in his individual capacity,<br><br>     Defendants. | Case No. 1:18-cv-11263<br><br>__JURY TRIAL DEMANDED__ |

### COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff The Chefs' Warehouse, Inc. ("Chefs' Warehouse" or "Plaintiff"), by and through its attorneys, Reed Smith LLP, brings this action against Defendants Local Union 1430, International Brotherhood of Electrical Workers, AFL-CIO ("Local 1430"), Dylan Wiley ("Wiley," and together with Local 1430, "Defendants") and alleges as follows:

### NATURE OF THE ACTION

1. This action arises from Defendants' unlawful, threatening and obscene behavior, in violation of Local 1430's collective bargaining agreement with Chefs' Warehouse, and federal and state laws.

2. Chefs' Warehouse is a nationally-renowned specialty food distributor business. Chefs' Warehouse maintains a portfolio of more than 43,000 imported and domestic food products providing service to the finest restaurants, hotels, caterers, culinary schools and specialty food stores in North America.

3.      On November 29, 2018, Defendants sent an email to Chefs' Warehouse raising, for the first time, a list of unwarranted demands, and threatening highly disruptive and destructive actions against Chefs' Warehouse's large and loyal customers. Defendants insisted that their demands be met immediately. *One demand is that Chefs' Warehouse fire one of its employees, without proper cause, describing that individual in the email as "a piece of shit."*

4.      There is no prior history of Defendants' purported grievances, and Defendants seemingly have an ulterior motive.  Many of these demands fall within the definition of grievances under Local 1430's Collective Bargaining Agreement with Chefs' Warehouse (the "CBA").  However, none of these grievances were previously filed in accordance with the grievance procedures outlined in the CBA, followed by arbitration if no resolution is otherwise possible. Instead, Defendants have engaged in an orchestrated and concerted campaign of attempted intimidation towards Chefs' Warehouse's customers.

5.      Plaintiffs tried to reason with Defendants, sending communications asking that they follow the appropriate procedures under the CBA. Instead, Plaintiffs were subjected to amateurish bullying and coercive tactics.  Besides making more irrational threats, Defendants sent Chefs' Warehouse's counsel a *photograph of defendant Wiley's middle finger*, and made crude and childish sexual insults, specifically, *asking counsel if he had "put … [his] tongue  in Mr. Papa's [CEO of Chefs' Warehouse, though spelled wrong] ass to get this job."*

6.      Worse, Defendants have contacted at least three customers of Chefs' Warehouse with threats that Defendants will disrupt their business with a "mob" of union members and a "large blow up rat." These baseless attempts at intimidation by Defendants have already resulted in Chefs' Warehouse losing one customer, and Chefs' Warehouse has been advised by another customer that "we as an organization do not wish for this dispute to negatively impact the

operation or the reputation of our business," and that "if [this dispute] is not resolved by close of business on Friday, December 7th, 2018 we will have to explore other vendor options."

7.      Worst of all, in relation to a presentation that will be given by Chefs' Warehouse at the Barclay's Center on December 5, 2018, Defendants have defamed Chefs' Warehouse by sending an email to the human resources department of the Barclay's Center stating: "Unfortunately, the Chefs Warehouse has a policy of supporting racist business practices, firing their employees arbitrarily, and not honoring their union contract.  I have reached out to leaders of the Black Lives Matter movement as well to support our cause.  It is our hope you will tell Chef's Warehouse they are not welcome at Barclays this Tuesday if they continue to honor racist business practices and treat their drivers like garbage."  At no time have Defendants provided support for their sweeping and scurrilous accusations.

8.      To the contrary, Chefs' Warehouse is one of the largest employers in the South Bronx, and its workforce there primarily consists of minorities.

9.      Defendants have signaled their intent to continue this campaign of defamation by "hand[ing] out leaflets notifying the public (and obviously your shareholders) of the racist business practices Chef's Warehouse supports," outside of the Barclay's Center event.

10.      Based on Local 1430's unlawful actions, Chefs' Warehouse asserts claims for breach of contract in violation of 29 U.S.C. § 185; and damages for unlawful secondary activity in violation of 29 U.S.C. § 158(b)(4)(i) and (ii), and 29 U.S.C. § 187.  Based on both Defendants' unlawful actions, Chefs' Warehouse asserts a claim of tortious interference with contractual relations and seeks injunctive relief.

**THE PARTIES**

11.      Plaintiff Chefs' Warehouse is a corporation duly formed and existing under the laws of the State of Delaware with its principal place of business at 100 East Ridge Road, Ridgefield, Connecticut 06877, and maintains a distribution center at 240 Food Center Drive Bronx, NY 10474.  The Drivers employed at the Bronx Distribution center are represented for purposes of collective bargaining by defendant Local 1430.

12.      Defendant Local 1430 is a labor organization within the meaning of the Labor Management Relations Act, with its principal place of operation located at 84 Business Park Drive, Suite 202, Armonk, New York 10504.

13.      Defendant Dylan Wiley is an individual who, upon information and belief, resides in the State of New York.  Wiley is the Business Agent of Local 1430.

**JURISDICTION AND VENUE**

14.      This complaint raises claims over which this Court has jurisdiction pursuant to 29 U.S.C. §§ 185 and 187.

15.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.      This Court has personal jurisdiction over Defendants because they are located in New York, and this action arises out of their conduct in New York.

17.      Venue lies in this District pursuant to 28 U.S.C. § 1391(a) because both Defendants are residents of the State of New York and Local 1430 resides within the Southern District of New York.  Alternatively, venue lies in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### Chefs' Warehouse Food Service Distribution Business

18.     Chefs' Warehouse, along with its network of affiliates, comprises specialty food distributor businesses that have been purveying artisan and high-quality food products for over twenty years.  Plaintiff maintains an expansive portfolio consisting of imported and domestic specialty food products, and a large customer base in the New York metropolitan area as well as across the United States.

19.     Chefs' Warehouse oversees a network of specialty food distributors operating throughout the United States and Canada focused on serving the specific needs of chefs who own and/or operate some of the leading menu-driven independent restaurants, fine dining establishments, country clubs, hotels, caterers, culinary schools, bakeries, patisseries, chocolatiers, cruise lines, casinos and specialty food stores.

### Chefs' Warehouse's Contractual Relationship with Local 1430

20.     Local 1430 was certified as the exclusive collective bargaining agent of Chefs' Warehouse's Bronx drivers in 2013. The current CBA between Chefs' Warehouse and Local 1430 remains in full force and effect through August 3, 2020, and for each and every year thereafter, unless either party desires to change, modify, or terminate the CBA.

21.     Article 11 of the CBA provides for a negotiated grievance procedure and final and binding arbitration for any disputes relating to or arising under that agreement.

22.     The CBA defines grievances as: "any complaints, disputes or questions as to the interpretation, application or performance of this Agreement by either the Employer or the Union."

23.     The CBA further sets forth a defined, negotiated procedure for resolving any such grievances, including an informal resolution process followed by direct negotiation and, if the dispute cannot be resolved amicably, arbitration:

**11.3 Grievance Resolution mechanism**. Should a Grievance arise, the Employer and Union both shall endeavor to resolve the Grievance in accordance with the following procedures:

(a) **Step 1**. <u>An Employee shall present the Grievance in writing to the Employer. Within five (5) business days from being presented with the Grievance, the Employer shall give the Employee a written answer to the grievance.</u>  Any grievance not presented in writing within seven (7) days after the date of occurrence or within seven (7) days after the date the Union should have reasonably known of the occurrence giving rise to the complaint shall be conclusively considered abandoned. If the Employee is not satisfied with the answer provided by the Employer, the Employee may proceed to step 2;

(b) **Step 2**. Within fifteen (15) days of receiving the Employer's response in Step 1, the Employee's shop steward or the Union shall present the Employer with a written Grievance that states the violation and remedy desired. The Employer and the Union shall attempt to resolve the Grievance through direct negotiation between themselves or their respective agents. The Employer shall provide the Union an answer in writing no later than three working days after the above mentioned meeting. If the Employee is not satisfied with the answer provided by the Employer, the Employee may proceed to step 3;

(c) **Step 3**. If the Grievance is not resolved in accordance with Article 11.3(b), either the Union or Employer may, within ten (10) days, request of the other that the Grievance be referred to Arbitration. If the party receiving the request fails to resolve the Grievance within ten (10) days after receiving the request, the requesting party may file for Arbitration with the American Arbitration Association in accordance with Article 11.5.

. . .

**11.5 Arbitration**. If a Grievance is not resolved through the procedure outlined in Article 11.3, the Employer or Union may file for arbitration as follows:

(a) The Union and Employer shall select an Arbitrator from a panel provided by the American Arbitration Association that was requested by the filing party in accordance with the rules and procedures of the American Arbitration Association.

(b) The decision of the Arbitrator shall be final and binding on both parties.

(c) The Arbitrator shall not (1) add to, (2) subtract from or (3) modify any of the terms of this Agreement or any Agreement that supplements this Agreement.

(d) The Union and Employer shall share equally in all costs incurred in arbitration, except the other party's legal fees and costs of preparation.

(Emphasis added.)

24.     The CBA also provides in Article 12 that Local 1430 may not cause any disturbances during the term of the Agreement, and "agrees to support the Employer fully in maintaining operations in every way":

**Strikes & Lockouts**

During the term of this Agreement, <u>there will be no strikes, sympathy strikes, work stoppages, picket lines, slowdowns, boycotts, disturbances or concerted failure or refusal to perform assigned work by the Union or any Employee</u>, and there will be no lockouts by the Employer for the duration of this Agreement. <u>The Union agrees to support the Employer fully in maintaining operations in every way.</u> Any Employee who participates in or promotes a strike, sympathy strikes, work stoppage, picket line, slowdown, boycott, disturbance or concerted failure or refusal to perform assigned work may be discharged or otherwise disciplined by the Employer, and only the question of whether he did in fact participate in or promote such action shall be subject to grievance and arbitration procedure.

It is recognized by the parties that the Employer is engaged in a business which is of importance to the general public and that any violation of this Article will cause irreparable damage to the Employer. Accordingly, it is understood and agreed that in the event of any violation of this Article, the Employer shall be entitled to seek and obtain immediate injunctive relief and such other relief as it may be entitled to.

Article 12 (Emphasis added.)

**<u>The November 29 Inciting Incident</u>**

25.     On or about the morning of November 29, 2018, a delivery driver for Chefs' Warehouse attempted to deliver product to a customer of Chefs' Warehouse (the "First Customer").

26.     Upon information and belief, during the delivery, there was a verbal altercation between the driver and an employee of the First Customer regarding the appropriate building entrance to be used for delivering products to the First Customer.

27.     Following the altercation, the driver indicated that the First Customer's employee had directed racially-charged derogatory language towards him (the "November 29 Incident").

28.     Chefs' Warehouse is currently investigating the November 29 Incident, but has not yet completed its investigation.

29.     The Chefs' Warehouse driver appropriately informed Wiley of the November 29 Incident and provided the First Customer's contact information to Wiley.

**Wiley's Threatening November 29 Email**

30.     On the evening of November 29, 2018, Wiley sent an email to several Chefs' Warehouse managers informing them that because of the November 29 Incident, Local 1430 would engage in a "peaceful informational campaign" with Chefs' Warehouse's clients beginning Monday, December 3, 2018 ("November 29 Email").  The November 29 Email also set forth six other alleged grievances purportedly related to the November 29 Incident, none of which had been raised prior to November 29, 2019, and none of which were related in any way to the November 29 Incident.  One demand is that Chefs' Warehouse fire a specific employee without proper cause, describing that employee in the email as "a piece of shit."

31.     Wiley also threatened that the "peaceful information campaign" would continue until Chefs' Warehouse addressed each of the six listed grievances in violation of the CBA and federal and state laws.

**Defendants' Unlawful Behavior**

32.     Shortly after receiving the November 29 Email, Chefs' Warehouse learned the true nature of Wiley's "peaceful information campaign": an attack specifically planned to disrupt and destroy the business of Chefs' Warehouse and its customers in violation of the CBA.

33.     On November 29, 2018, Chefs' Warehouse received a call from the First Customer, informing Chefs' Warehouse that someone from Local 1430 had called its human resources department, threatening to picket and disrupt the First Customer's business with a "mob" of union members, and to install a giant inflatable rat outside of its place of business.

34.     The First Customer informed Chefs' Warehouse that as a result of this threat by Defendants, the owners of the First Customer advised their staff *not to order from Chefs' Warehouse again*.

35.     That same day, only about four hours after the November 29 Incident, Chefs' Warehouse received a call from the chef of another customer (the "Second Customer"), informing Chefs' Warehouse that a representative of Local 1430 called the Second Customer's human resources department, threatening to put a giant inflatable rat in front of the Second Customer's place of business as well.

36.     The Second Customer, one of Chefs' Warehouse largest customers, has no relationship to the First Customer or to the November 29 Incident.

37.     On November 30, 2018, the Second Customer sent an email to Chefs' Warehouse, informing it that the Second Customer would *terminate* its business relationship with Chefs' Warehouse if the dispute with Local 1430 was not resolved by the close of business on Friday, December 7, 2018.

38.     On December 2, 2018, Defendants contacted two more customers (the "Third Customer" and the "Fourth Customer") of Chefs' Warehouse, threatening to intrude on those customers' place of business with giant rats if the customers continued doing business with Chefs' Warehouse.

39.     Defendants have indicated that they plan to make similar threats and acts of disruption against other customers of Chefs' Warehouse beginning on Monday, December 3, 2018.

40.     Defendants have threatened other acts of disruption.   On December 2, 2018, Wiley emailed and left a voice message for Chefs' Warehouse, threatening to defame Chefs' Warehouse at the upcoming "Eat, Sleep Play – It's Not All Discretionary Conference" at the Barclay's Center on December 5, 2018.  Defendants stated their intention to hand out leaflets to the public outside of a presentation that will be given by Chefs' Warehouse at the Conference that day, falsely accusing Chefs' Warehouse of supporting racist business practices.   Wiley specified that he intended for Chefs' Warehouse's shareholders to see the leaflets.   A true and correct copy of the December 2, 2018 Email from D. Wiley is attached hereto as Exhibit A.

41.     Worst of all, Defendants have defamed Chefs' Warehouse by emailing the Barclay's Center directly, falsely accusing Chefs' Warehouse of supporting racist business practices, firing employees arbitrarily, not honoring the union contract, and treating drivers like garbage.  A true and correct copy of the December 3, 2018 Email from D. Wiley is attached hereto as Exhibit B.

42.     These accusations could not be further from the truth, and Defendants have presented no evidence at all to back up these sweeping and scurrilous accusations.

43.    Upon information and belief, Defendants' ulterior motive for this unlawful behavior is to force Chefs' Warehouse to agree not to contest Local 1430's desire to expand its representation to other areas of Chefs' Warehouse's business, for the primary purpose of expanding Defendants' collection of dues.

44.    The unlawful actions by Defendants have already resulted in Chefs' Warehouse's loss of the First Customer, and threatens to cause additional customer losses and significant damage to Chefs' Warehouse's reputation and goodwill.

**Defendants Belligerently And Obscenely Refuse To Engage In The CBA Process**

45.    On November 30, 2018, counsel for Chefs' Warehouse sent a letter to Wiley, informing Defendants that they had failed to follow the appropriate process for resolving grievances under the CBA, and that Chefs' Warehouse intended to seek legal action to defend its rights.

46.    In response, Wiley childishly attempted to bully Chefs' Warehouse by threatening to forward the November 30 Letter to local news media outlets, and including a photograph of Mr. Wiley's hand with his middle finger extended.  A true and correct copy of the November 30, 2018 Email from D. Wiley is attached hereto as Exhibit C.

47.    On December 1, 2018, counsel for Chefs' Warehouse again wrote to Defendants to inform them that Chefs' Warehouse intended to file two unfair labor practice charges with the National Labor Relations Board ("NLRB") because of Defendants' unlawful conduct.

48.    In his email response, Wiley grew more belligerent and immature, refusing to engage in any constructive manner and instead obscenely responding by inquiring if counsel "put …[his] tongue  in Mr. Papa's ass to get this job."  Christopher Pappas is the chief Executive

Officer of Chefs' Warehouse.  A true and correct copy of the December 1, 2018 Email from D. Wiley is attached hereto as Exhibit D.

49.     Defendants' actions and threats, including their numerous threats made in the November 29 Email, and the threats made to customers of Chefs' Warehouse, violate the grievance procedures agreed to by Local 1430 in the CBA.

50.     Instead of following the CBA's grievance procedures in Article 11, Defendants wrote to Chefs' Warehouse after business hours on November 29, 2018 identifying six grievances and threatening to intentionally interfere with Chefs' Warehouse's business relationships with its customers, unless Defendants' demands were not immediately met. These demands, sent under the pretext of an unrelated incident with a customer, had never before been raised by Local 1430 or by any employee of Chefs' Warehouse.  To the extent that any of these grievances were known by Local 1430 more than seven days prior to November 29, 2018, these grievances are conclusively considered abandoned under Article 11.3(a) of the CBA.

51.     Defendants' communications confirm that they have no intention of appropriately resolving their claimed grievances pursuant to the CBA, and have decided to engage in an unlawful campaign designed to harass and intimate Chefs' Warehouse's customers instead.

**Plaintiff And Its Customers Have Suffered And Continue To Suffer
Irreparable Harm Due To Defendants' Actions**

52.     Defendants' threatening actions have caused the First Customer to terminate its business relationship with Chefs' Warehouse. The Second Customer has stated that it will terminate its business relationship with Chefs' Warehouse as a result of Defendants' threats unless this dispute is resolved by Friday, December 7, 2018.

53.     Given Defendants' recent unlawful threats and actions, including their obscene communications to counsel, Plaintiff has little reason to believe this dispute can be resolved

quickly. Defendants' actions, if permitted to continue, will cause severe economic and reputational harm to Chefs' Warehouse.

54.     The targeting of additional customers of Chefs' Warehouse is more than an abstract possibility, as Defendants have already harassed at least the Third and Fourth Customers, and have promised to harass other customers of Chefs' Warehouse beginning Monday, December 3, 2018 through their purported "peaceful informational campaign."

55.     Additionally, Defendants have promised to hand out leaflets in front of a presentation made by Chefs' Warehouse, spreading false and defamatory statements about Chefs' Warehouse to the public.

56.     Further, Defendants have defamed Chefs' Warehouse to the Barclay's center, alleging a number of false accusations at Chefs' Warehouse in an attempt to undermine Chefs' Warehouse's business relations with the Barclay's Center.

57.     As a result of Defendants' harassment of Chefs' Warehouse's customers, Chefs' Warehouse has suffered irreparable harm, and will continue to suffer irreparable harm until such harassment ceases.

**<u>FIRST CAUSE OF ACTION</u>**
**Breach of Contract – Against Local 1430**
**29 U.S.C. § 185**

58.     Chefs' Warehouse re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

59.     Pursuant to Article 11 the CBA, Local 1430 agreed to follow a multiple-step grievance procedure through which all grievances by Local 1430 under the CBA would be presented in writing to Chefs' Warehouse, providing Chefs' Warehouse with the opportunity to investigate and respond to these grievances.  In the event that the parties are unable to come to a

resolution through negotiation, the grievance procedures permit either party to seek adjudication of its grievances only through arbitration with the American Arbitration Association.

60.     Pursuant to Article 12 of the CBA, Local 1430 further agreed, among other terms, that (i) during the term of the CBA, there would be no strikes, sympathy strikes, work stoppages, picket lines, slowdowns, boycotts, disturbances, or concerted failure or refusal to perform assigned work by Local 1430 or by any Chefs' Warehouse employee; (ii) Local 1430 will support Chefs' Warehouse fully in maintaining operations in every way; (iii) any employee who participates in or promotes any activity prohibited under Article 12 shall be subject to grievance and arbitration procedure; and (iv) that in the event of any violation of Article 12, Chefs' Warehouse is entitled to seek and obtain immediate injunctive relief and such other relief as it may be entitled to.

61.     Local 1430 has breached Article 11 of the CBA by, among other things, presenting grievances that are covered by the grievance procedure in the CBA, yet refusing to comply with those procedures by: (i) refusing to engage in a discussion of its grievances with Chef's Warehouse as required under the CBA; and (ii) rejecting the arbitration provision in Article 11 and instead engaging in unlawful conduct by threatening to harass customers of Chefs' Warehouse, and by threatening to defame Chefs' Warehouse to the public and to Chefs' Warehouse's shareholders, in an attempt to force Chefs' Warehouse to comply with its demands.

62.     Local 1430 has also breached Article 12 of the CBA annexed hereto by, among other things, threatening to engage in picketing and disturbances in an attempt to harm the operations of Chefs' Warehouse.

63.     As a result of Local 1430's breaches of the CBA with Chefs' Warehouse, Chefs' Warehouse has suffered damages, including, but not limited to, loss of customers, loss of

business opportunities, and harm to its reputation and goodwill.

64.     As a result of Local 1430's breaches, Chefs' Warehouse seeks, among other remedies, injunctive relief and damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**Unlawful Secondary Activity – Against Local 1430**
**29 U.S.C. § 158(b)(4)(i) and (ii); 29 U.S.C. § 187**

65.     Chefs' Warehouse re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

66.     Local 1430, by and through its agents and/or representatives, has threatened, coerced, and/or restrained neutral secondary employers and persons, an object of which was to force or require such secondary employers and persons to cease using, purchasing, selling, handling, transporting, or otherwise dealing in the products of and/or with Chefs' Warehouse, or in the alternative, cause the cessation of business with Chefs' Warehouse.

67.     Local 1430 threatened the First Customer under the pretext of the November 29 Incident in order to harm Chefs' Warehouse by damaging its relationship with the First Customer.

68.     Local 1430 further threatened the Second, Third, and Fourth Customers, which have no relationship to the November 29 Incident, specifically to harm Chefs' Warehouse by damaging its relationship with the Second, Third, and Fourth Customers.

69.     The conduct of Local 1430 constitutes unlawful secondary activity, which is prohibited by § 8(b)(4)(i) and (ii) of the National Labor Relations Act, 29 U.S.C. § 158.

70.     The conduct of Local 1430 is unlawful pursuant to § 303 of the Labor Management Relations Act, 29 U.S.C. § 187, and Chefs' Warehouse is entitled to seek relief for all available and applicable damages therein pursuant to § 303(b) thereof.

71.     As a direct and proximate result of the above-described unlawful conduct of Local 1430, at least one customer of Chefs' Warehouse has already terminated its business relationship with Chefs' Warehouse, and at least one other customer has threatened to end its business relationship with Chefs' Warehouse if its dispute with Defendants is not resolved by Friday, December 7, 2018.  These terminations preclude Chefs' Warehouse from earning the profits that it otherwise would have earned had it not been for Local 1430's unlawful secondary conduct.

72.     By reason of the foregoing, Chefs' Warehouse is entitled to damages in an amount of its lost profits, legal fees, additional costs, or in such other amount as may be determined upon the trial of this action.

### THIRD CAUSE OF ACTION
**Defamation – Against All Defendants**

73.     Chefs' Warehouse re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

74.     On December 3, 2018, Defendants sent an email to the human resources department of the Barclay's Center.  In the email, Defendants stated: "Unfortunately, the Chefs Warehouse has a policy of supporting racist business practices, firing their employees arbitrarily, and not honoring their union contract.  I have reached out to leaders of the Black Lives Matter movement as well to support our cause.  It is our hope you will tell Chef's Warehouse they are not welcome at Barclays this Tuesday if they continue to honor racist business practices and treat their drivers like garbage."

75.     These statements have absolutely no basis in fact.  At no point has Chefs' Warehouse ever supported any racist business practice, or maintained any policy of supporting racist business practices.  To the contrary, Chefs' Warehouse would never support any racist

business practice on the part of any of its customers, and would never support any discrimination against any of its employees.

76.     In fact, Chefs' Warehouse is one of the largest employers in the South Bronx, and its workforce there primarily consists of minorities.

77.     No instances of racial animus exhibited towards any Chefs' Warehouse driver had been reported to Chefs' Warehouse prior the November 29 Incident, which Chefs' Warehouse is currently investigating rigorously.

78.     Additionally, Chefs' Warehouse does not fire its employees arbitrarily, Chefs' Warehouse honors the CBA, and Chefs' Warehouse does not by any means treat its drivers "like garbage."

79.     On information and belief, Defendants either: (i) knew that the statements contained in the December 3, 2018 email were false at the time they were sent; or (ii) acted with reckless disregard to whether or not the statements contained in the December 3, 2018 email were false.

80.     As a result of Defendant's actions, Chefs' Warehouse has suffered actual damages in the form of harm to Plaintiff's reputation and goodwill, and damage to its business relationships.

### FOURTH CAUSE OF ACTION
**Tortious Interference with Contractual Relations – Against All Defendants**

81.     Chefs' Warehouse re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

82.     A valid contractual relationship exists between Chefs' Warehouse and the First Customer.

83.     A valid contractual relationship exists between Chefs' Warehouse and the Second Customer.

84.     A valid contractual relationship exists between Chefs' Warehouse and the Third Customer.

85.     A valid contractual relationship exists between Chefs' Warehouse and the Fourth Customer.

86.     Upon information and belief, Defendants possessed knowledge and information of the existence of the contracts between Chefs' Warehouse and the First, Second, Third, and Fourth Customers.

87.     Defendants intentionally and improperly harassed and threatened the First, Second, Third, and Fourth Customers, threatening them with a mob of picketers and giant inflatable rats placed in front of their places of business.

88.     This wrongful conduct was undertaken without justification, with the sole intent of interfering with the First, Second, Third, and Fourth Customers' agreements with Chefs' Warehouse in an attempt to induce these customers to terminate their contractual relationships with Chefs' Warehouse.

89.     Defendants' conduct has directly caused the First Customer to terminate its business relationship with Chefs' Warehouse, and the Second Customer has threatened to terminate its business relationship with Chefs' Warehouse on Friday December 7, 2018 unless this dispute is fully resolved by that date.

90.     As a result of Defendants' tortious interference, Chefs' Warehouse has suffered damages, including, but not limited to, loss of customers, loss of business opportunities, and harm to its reputation and goodwill.

91.     As a result of Defendants' wrongful conduct, Chefs' Warehouse seeks, among other remedies, injunctive relief and damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Injunctive Relief – Against All Defendants

92.　　Chefs' Warehouse re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

93.　　Chefs' Warehouse and Local 1430 have agreed in Article 11 of the CBA to final and binding arbitration as the exclusive method for the peaceful resolution of disputes arising under or involving the application or interpretation of the CBA.

94.　　Chefs' Warehouse and Local 1430 have agreed in Article 12 of the CBA that in exchange for the commitment to peacefully resolve disputes through arbitration, neither party will engage in any strike, lockout or disturbance and that "the Union agrees to support the Employer fully in maintaining operations in every way."

95.　　In order the fulfill the national labor policy of peacefully resolving labor disputes through arbitration rather than disruptive self-help, Chefs' Warehouse seeks an injunction maintaining  the status quo while Local 1430's grievances are processed through the parties' contractual  grievance and arbitration  procedure.

96.　　Chefs' Warehouse is willing to arbitrate those disputes that properly arise under the CBA.

97.　　Unless injunctive relief is granted directing Defendants to follow the contractual grievance and arbitration procedure under Article 11 of the CBA and to refrain from threatening and disruptive behavior in violation of Article 12 of the CBA, Defendants' campaign of harassment of Chefs' Warehouse's customers will cause irreparable harm to Chefs' Warehouse's reputation and goodwill.

98.　　Chefs' Warehouse has no adequate remedy at law for its present and threatened injuries.

99.     As such, Chefs' Warehouse is entitled to temporary, interlocutory, and permanent injunctive relief enjoining, restraining, and staying Defendants from (i) contacting or disparaging any customer of Chefs' Warehouse, or any employee of any customer of Chefs' Warehouse; and (ii) picketing, handing out literature, amassing, placing an inflatable rat, or otherwise demonstrating in any way in front of or near any place of business operated by any customer of Chefs' Warehouse.

## PRAYER FOR RELIEF

WHEREFORE, Chefs' Warehouse respectfully prays for relief and judgment in its favor:

A.     Awarding damages, costs, fees, and disbursements, including reasonable attorneys' fees, in an amount to be determined at trial;

B.     Enjoining, restraining, and staying Defendants and anyone acting at their direction from: (i) contacting or disparaging any customer of Chefs' Warehouse, or any employee of any customer of Chefs' Warehouse; and (ii) picketing, handing out literature, amassing, placing an inflatable rat, or otherwise demonstrating in any way in front of or near any place of business operated by any customer of Chefs' Warehouse;

C.     Requiring Defendants to resolve their grievances in accordance with the terms in the CBA;

D.     Ordering any other and further relief as the Court deems just, equitable and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all claims so triable asserted herein.

Dated: New York, New York
      December 3, 2018

                                         Respectfully submitted,

                                         **REED SMITH LLP**

                                      By:   */s/Steven Cooper*
                                              Steven Cooper
                                              John B. Webb
                                              Jeremy Berman
                                              599 Lexington Avenue
                                              New York, NY  10022
                                              Tel:  (212) 521-5400
                                              Fax:  (212) 521-5450
                                              Email: scooper@reedsmith.com
                                                           jwebb@reedsmith.com
                                                           jberman@reedsmith.com

                                              *Attorneys for Plaintiff*
                                              *The Chefs' Warehouse, Inc.*