UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

THE CHEFS' WAREHOUSE, INC.,

       Plaintiff,

    -v-

DYLAN WILEY and LOCAL UNION
1430, INTERNATIONAL
BROTHERHOOD OF ELECTRICAL
WORKERS AFL-CIO,

       Defendants.

---------------------------------------------------------------

18-CV-11263 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

  Plaintiff The Chefs' Warehouse ("Chefs' Warehouse") brings this action against Local Union 1430, International Brotherhood of Electrical Workers AFL-CIO ("Local 1430") and its Business Agent, Dylan Wiley ("Wiley") (collectively "Defendants"), alleging unlawful secondary activity under the National Labor Relations Act, breach of contract, and defamation. Defendants move to dismiss the action. For the reasons that follow, the motion is granted in part and denied in part.

**I. Background**

  The factual allegations below are taken from Chefs' Warehouse's amended complaint (Dkt. No. 19 ("AC")) and are assumed to be true for purposes of deciding this motion.

  Plaintiff Chefs' Warehouse is a nationally renowned specialty food distributor business in the United States. (AC ¶ 2.) It maintains a distribution center at 240 Food Center Drive, Bronx, New York ("Bronx Distribution Center"). (AC ¶ 11.) Defendant Local 1430, a labor organization, represents Chefs' Warehouse's drivers at the Bronx Distribution Center for

1

collective bargaining purposes. (AC ¶ 11–12.) Defendant Wiley is the Business Agent of Local 1430. (AC ¶ 13.)

Chefs' Warehouse has a collective bargaining agreement ("CBA") with Local 1430 that was effective during the relevant period. (AC ¶ 20.) The CBA provides for a grievance and arbitration procedure to resolve any disputes arising under the CBA. (AC ¶ 21.) Under the CBA, a "grievance" is defined as "any complaints, disputes or questions as to the interpretation, application or performance of [the CBA] by either [Chefs' Warehouse] or [Local 1430]." (AC ¶ 22.) The CBA's procedure for resolving a grievance (the "Grievance Procedure") is as follows:

> **11.3 Grievance Resolution mechanism**. Should a Grievance arise, the Employer and Union both shall endeavor to resolve the Grievance in accordance with the following procedures:
>
> (a) **Step 1**. An Employee shall present the Grievance in writing to the Employer. Within five (5) business days from being presented with the Grievance, the Employer shall give the Employee a written answer to the grievance. . . .

(AC ¶ 23.) If the parties are unable to resolve their grievance through the Grievance Procedure, the CBA also provides for an arbitration procedure (the "Arbitration Procedure"):

> **11.5 Arbitration**. If a Grievance is not resolved through the procedure outlined in Article 11.3, the Employer or Union may file for arbitration as follows:
>
> (a) The Union and Employer shall select an Arbitrator from a panel provided by the American Arbitration Association that was requested by the filing party in accordance with the rules and procedures of the American Arbitration Association.
>
> (b) The decision of the Arbitrator shall be final and binding on both parties.

(AC ¶ 23.) In addition, the CBA contains a no-strike clause which provides:

> During the term of this Agreement, there will be no strikes, sympathy strikes, work stoppages, picket lines, slowdowns,

2

> boycotts, disturbances or concerted failure or refusal to perform assigned work by the Union or any Employee, and there will be no lockouts by the Employer for the duration of this Agreement. The Union agrees to support the Employer fully in maintaining operations in every way.

(AC ¶ 24.)

On or about November 29, 2018, a Chefs' Warehouse's delivery driver was involved in a verbal altercation (the "Incident") while delivering product to a Chefs' Warehouse customer (the "First Customer"). (AC ¶¶ 25–26.) Following the altercation, the driver alleged that the First Customer's employee had directed racially charged derogatory language toward him. (AC ¶ 27.)

On the same day, Chefs' Warehouse received a call from the First Customer, informing Chefs' Warehouse that someone from Local 1430 had threatened to picket and disrupt First Customer's business with a mob of union members and to install a giant inflatable rat outside of its place of business. (AC ¶ 32.) As a result, the First Customer terminated its business relationship with Chefs' Warehouse. (AC ¶ 33.)

Also on November 29, 2018, Chefs' Warehouse received a call from another customer (the "Second Customer"), informing Chefs' Warehouse that someone from Local 1430 had threatened to place a giant inflatable rat in front of its place of business. (AC ¶ 34.) Subsequently, the Second Customer informed Chefs' Warehouse that it "would *terminate* its business relationship with Chefs' Warehouse if the dispute with Local 1430 was not resolved by the close of business on Friday, December 7, 2018." (AC ¶ 36 (emphasis in original).)

One day after the Incident, Local 1430 contacted another Chefs' Warehouse customer (the "Third Customer") and threatened that a mob would come to the front of the store to protest how Chefs' Warehouse treats its drivers. (AC ¶ 37.) Within a week of the Incident, Local 1430 contacted two more Chefs' Warehouse's customers (the "Fourth Customer" and the "Fifth

Customer") and threatened to set up a giant rat if they continue to do business with Chefs' Warehouse. (AC ¶ 38.)

In addition to threatening to picket at Chefs' Warehouse's customers, Local 1430 engaged in a publicity campaign. On December 2, 2018, Wiley informed Chefs' Warehouse that Local 1430 intended to hand out leaflets accusing Chefs' Warehouse of supporting racist business practices outside the Barclays Center, where Chefs' Warehouse would be giving a presentation for an industry conference.[1] (AC ¶ 40.) Wiley also emailed the Barclays Center to make similar accusations. (AC ¶ 41.) In addition, Wiley posted comments accusing Chefs' Warehouse of supporting racist business practices on the social media pages of Chefs' Warehouse and two of its customers. (AC ¶¶ 43–45.)

Chefs' Warehouse and Defendants had turbulent communications throughout the relevant period. For example, on November 29, 2018, Wiley emailed Chefs' Warehouse and stated that, because of the Incident, Local 1430 would engage in a "peaceful informational campaign" targeting Chefs' Warehouse's customers beginning on Monday, December 3, 2018. (AC ¶ 29.) The email alleged six other grievances (AC ¶ 29), which Wiley insisted had to be addressed before he would call off the "peaceful informational campaign" (AC ¶ 30).

In a letter to Wiley dated November 30, 2018, Chefs' Warehouse's counsel informed Defendants that they had failed to follow the appropriate grievance resolution process under the CBA, and that Chefs' Warehouse intended to seek legal remedies. (AC ¶ 48.) In response, Wiley sent an email threatening to forward the November 30 letter to the local news media and attaching a photograph of his middle finger. (AC ¶ 49; *see* Dkt. No. 19-5.) On December 1, 2018, counsel for Chefs' Warehouse again wrote to Defendants informing them that Chefs'

---

[1] The amended complaint misspells Barclays Center as Barclay's Center. (*See* AC ¶ 7.)

Warehouse intended to file two unfair labor practice charges with the National Labor Relations Board ("NLRB"). (AC ¶ 50.) Wiley responded with an obscene personal attack on Chefs' Warehouse's counsel. (AC ¶ 51; *see* Dkt. No. 19-6.) Moreover, after Chefs' Warehouse brought this action, Defendants threatened to "increase [their] actions" because of the pending litigation. (AC ¶ 61.)

Chefs' Warehouse filed this action on December 3, 2018, asserting breach of contract and unlawful secondary activity claims against Local 1460, and defamation and tortious interference with contractual relations claims against both Defendants. (Dkt. No. 1.) Defendants moved to dismiss the complaint on December 17, 2018. (Dkt. No. 13.)[2] In response, Chefs' Warehouse amended its complaint, dropping the defamation claim against Local 1460 and the tortious inference with contractual relations claim entirely. (Dkt. No. 19.) Defendants' motion to dismiss the amended complaint, which is now fully briefed, is ripe for resolution. (*See* Dkt. Nos. 22–27.)

## II. Legal Standard

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads facts that would allow "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must "accept[] as true the factual allegations in the complaint and draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (quoting *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d

---

[2] Because Defendants' motion to dismiss the initial complaint was superseded by its subsequent motion to dismiss the amended complaint, the initial motion (Dkt. No. 13) is denied as moot.

211, 214 (2d Cir. 2003)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## III. Discussion

Plaintiff's amended complaint purports to assert four causes of action. Against Local 1430, Plaintiff alleges breach of contract (AC ¶¶ 63–69), and unlawful secondary activity in violation of Section 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 158(b)(4) (AC ¶¶ 70–78). Against Wiley, Plaintiff asserts a defamation claim. (AC ¶¶ 79–89.) Against both Defendants, Plaintiff seeks injunctive relief. (AC ¶¶ 90–97.) Each claim is addressed in turn.

### A. Breach of Contract

Chefs' Warehouse alleges that Local 1430 breached the CBA because it failed to comply with the CBA's no-strike clause, the Grievance Procedure, and the Arbitration Procedure. (AC ¶¶ 63–69.) Defendants argue that Local 1430 has not violated the CBA because those three provisions do not apply to Local 1430's conduct. (Dkt. No. 23 at 14–18.) The conduct at issue, for purposes of the breach of contract claim, is Local 1430's threats directed at Chefs' Warehouse's customers and its subsequent refusal to follow the Grievance Procedure and the Arbitration Procedure. (AC ¶¶ 66–67.)

To establish a breach of contract under New York law, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the claimant, (3) breach of contract by the accused, and (4) damages." *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (internal quotation marks and alterations omitted). To resolve this dispute, the Court must examine the meaning of each of the relevant CBA provisions to

determine its applicability. *See Oppenheimer & Co., Inc. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) ("In a dispute over the meaning of a contract, the threshold question is whether the contract terms are ambiguous, . . . which is a question of law for the Court to decide on a claim-by-claim basis[.]") (citation omitted).

### 1. No-Strike Clause

Chefs' Warehouse argues that Local 1430's threats to picket its customers constitute a "disturbance," which is prohibited under the CBA's no-strike clause. When interpreting collective bargaining agreements, courts apply the "traditional rules of contract interpretation." *Aeronautical Indus. Dist. Lodge 91 of the Int'l Ass'n of Machinists v. United Tech. Corp.*, 230 F.3d 569, 576 (2d Cir. 2000). "When provisions in the agreement are unambiguous, they must be given effect as written. . . . In addition, as with all contracts, courts should attempt to read CBAs in such a way that no language is rendered superfluous." *Id.* (citations omitted). In interpreting the no-strike clause at issue, the Court is also mindful that "a union's intention to waive a statutorily protected right must be clear and unmistakable." *U.S. v. Int'l Bhd. of Teamsters*, 905 F.2d 610, 615 (2d Cir. 1990); 29 U.S.C. § 163 (union's statutory right to strike).

The no-strike clause at issue provides:

> During the term of this Agreement, there will be no strikes, sympathy strikes, work stoppages, picket lines, slowdowns, boycotts, disturbances or concerted failure or refusal to perform assigned work by the Union or any Employee, and there will be no lockouts by the Employer for the duration of this Agreement. The Union agrees to support the Employer fully in maintaining operations in every way.

(AC ¶ 24.)

The first sentence of the no-strike provision specifies several categories of prohibited conduct. Chefs' Warehouse argues that the word "disturbances" in the first sentence can be interpreted to "include[] threats of picketing and violence against non-parties in order to induce

7

them to terminate their relationships with Plaintiff." (Dkt. No. 26 at 13.) Chefs' Warehouse, however, does not provide any justification for this definition of "disturbances." Nor does it define the outer limits of "disturbances." This raises a potential problem: if "disturbances" is defined too broadly, the rest of the first sentence might be rendered superfluous, as one can reasonably argue that any strike or work stoppage would be a "disturbance." Courts generally seek to avoid such an interpretation of a contract where possible. *Cf. LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("[A]n interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'" (alteration in original) (internal citation omitted)).

The second sentence of the no-strike provision provides guidance as to what the parties intended to prohibit with the no-strike provision. It reads: "[t]he Union agrees to support the Employer fully in maintaining operations in every way." (AC ¶ 24.) This sentence, which follows the sentence that lists the specific conduct prohibited by the no-strike provision, suggests that the underlying goal of the provision is to maintain operations. This underlying goal informs the Court's interpretation of "disturbances" in the first sentence. *M & G Polymers USA, LLC v. Tackett*, 135 S.Ct. 926, 933 (2015) (stating that the parties' intentions control the interpretation of a collective-bargaining agreements).

With the goal of maintaining operations in mind, it is at least plausible that the parties clearly and unmistakably intended Local 1430 to refrain from inducing Chefs' Warehouse's customers to terminate business relationship with Chefs' Warehouse, because such conduct would necessarily damage Chefs' Warehouse's business operation. Indeed, Chefs' Warehouse has alleged that the First Customer has already ceased doing business with it due to Local 1430's conduct. (AC ¶¶ 33, 47.) Of course, evidence uncovered during discovery might show that the

8

parties never clearly and unmistakably intended the word "disturbances" to cover the conduct at issue. But, in light of the liberal pleading standard at the motion to dismiss stage, it is premature to dismiss Chefs' Warehouse's claim.

Relying upon *Englehard Corp. v. N.L.R.B.*, 437 F.3d 374, 378 (3d Cir. 2005), Defendants contend that the no-strike clause does not "clearly and unmistakably waive" Local 1430's right to engage in the conduct at issue, and thus Local 1430 did not violate the no-strike clause. (Dkt. No. 23 at 14.)

*Englehard*'s reasoning, however, is consistent with this Court's conclusion. In *Englehard*, the Third Circuit faces the question whether the union's picketing at an off-site shareholders' meeting violated the no-strike provision in the CBA. *Englehard*, 437 F.3d at 375. The employer in *Englehard* argued that the no-strike provision waived the union's right to picket "not only [at the employer's] facilities but also its annual shareholders' meeting." *Id.* at 378. But because the language and the structure of the no-strike provision indicated that the parties intended the no-strike provision to prevent work stoppage, and because the union's picket did not stop any work, the *Englehard* court decided that the union's picket did not violate the no-strike provision. *Id.* at 381. Here, as discussed earlier, it is at least plausible that Local 1430 clearly and unmistakably waived its right to engage in the conduct at issue in light of the no-strike provision's underlying goals of maintaining Chefs' Warehouse's business operation. And because Local 1430's conduct allegedly damaged Chefs' Warehouse's business operation, it potentially undermined the parties' explicit intention of "maintaining operations" set out in the no-strike clause. Hence, even applying *Englehard*, Defendants' argument fails.

Accordingly, Chefs' Warehouse has stated a plausible claim of breach of the no-strike provision in the CBA.

### 2. Grievance Procedure and Arbitration Procedure

Chefs' Warehouse also argues that Local 1430 breached the Grievance Procedure and the Arbitration Procedure, which require Local 1430 to follow certain steps to address its grievances with Chefs' Warehouse. (AC ¶¶ 64, 66.) Conversely, Defendants contend that these procedures are not mandatory as applied to Local 1430's conduct because the relevant provisions in the CBA use words like "endeavor" and "may." (Dkt. No. 23 at 16–18.) The Court holds that both the Grievance and Arbitration Procedures are mandatory per the plain language of the CBA.

First, the plain meaning of the Grievance Procedure provision makes it mandatory regardless of the type of conduct Local 1430 engages in. (Dkt. No. 26 at 9–12.) The Grievance Procedure provides that Local 1430 "shall endeavor to resolve the Grievance in accordance with the . . . procedures." (AC ¶ 23.) The word "endeavor" follows a modal verb "shall" which means Local 1430 is obliged to endeavor to follow the Grievance Procedures to resolve its grievance. As Local 1430 has allegedly refused to engage in the process of addressing its grievances in accordance with the Grievance Procedure, Chefs' Warehouse has plausibly alleged that Local 1430 has violated its obligation under the CBA. (AC ¶ 66.)

Second, the Arbitration Procedure is also mandatory. It provides that Local 1430 "may file for arbitration" if its grievance is not resolved after going through the grievance procedure. (AC ¶ 23.) Local 1430's argument that the word "may" renders the Arbitration Procedure optional and permissive has been rejected by courts. *See, e.g.*, *Local 771, I.A.T.S.E. v. RKO General, Inc., WOR Division*, 546 F.2d 1107, 1116 (2d Cir. 1977) (stating that arbitration is mandatory despite the use of the word "may" in the arbitration clause of a CBA); *Bonnot v. Cong. of Indep. Unions, Local No. 14*, 331 F.2d 355, 359–360 (8th Cir. 1964) ("The obvious purpose of the 'may' language is to give an aggrieved party the choice between arbitration or the abandonment of its claim. The presence of this or similar language has not prevented the

conclusion that a claim, if pressed, is compulsorily subject to arbitration."). Accordingly, the Arbitration Procedure here is also mandatory and Local 1430's failure to comply constitutes an actionable breach.

Chefs' Warehouse has stated a plausible breach of contract claim based on Local 1430's violation of the Grievance Procedure and the Arbitration Procedure.

### B. Unlawful Secondary Activity Claim

Chefs' Warehouse claims that Local 1430 has threatened its customers to cease doing business with it, thereby violating Section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4) ("Section 8(b)(4)") and Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187.[3] (AC ¶¶ 70–78.) Section 8(b)(4) prohibits labor unions from engaging in unlawful secondary activity, *i.e.*, activity directed at a third party, or a "'neutral employer,' with whom the union does not have a dispute." *C&D Restoration, Inc. v. Laborers Local 79*, No. 02 Civ. 9448, 2004 WL 736915, at *3 (S.D.N.Y. Apr. 5, 2004); 29 U.S.C. § 158(b)(4). Here, it is indisputable that Local 1430's alleged conduct is secondary activity because it was directed toward Chefs' Warehouse's customers with which Local 1430 did not have disputes to put pressure on Chefs' Warehouse. Therefore, Section 8(b)(4) is applicable and the Court examines whether Chefs' Warehouse has stated a plausible claim.

#### 1. Section 8(b)(4)(i)

Chefs' Warehouse first claims that Local 1430 violated Section 8(b)(4)(i). (AC ¶ 75.) Section 8(b)(4)(i) explicitly prohibits a labor union's conduct that is targeted at "any individual employed by" the secondary employer. *See* 29 U.S.C. § 158(b)(4)(i). But because the amended complaint does not allege that any of Local 1430's threats were targeted at the *employees* of

---

[3] 29 U.S.C. § 187 provides the remedy for violations of § 158(b)(4).

Chefs' Warehouse's customers, Section 8(b)(4)(i) is inapplicable and any claim under that provision must be dismissed.

### 2. Section 8(b)(4)(ii)(B)

Chefs' Warehouse next argues that Local 1430's conduct violates Section 8(b)(4)(ii)(B), which prohibits unions from threatening secondary employers from doing business with the primary employer.[4] *See* 29 U.S.C. § 158(b)(4)(ii)(B). To properly assert a Section 8(b)(4)(ii)(B) claim, a plaintiff must allege that (1) the union threatened, coerced, or restrained a secondary employer; (2) the union did so to induce the secondary employer "to cease doing business with the plaintiff"; and (3) the unlawful secondary activities caused the plaintiff's injury. *Capitol Awning Co., Inc. v. Local 137 Sheet Metal Workers Int'l Ass'n*, 698 F. Supp. 2d 308, 322 (E.D.N.Y. 2010). Here, Chefs' Warehouse alleges that Local 1430 threatened to picket five of Chefs' Warehouse's customers unless they ceased doing business with Chefs' Warehouse. As a result, the First Customer terminated its business relationship with Chefs' Warehouse (AC ¶ 33), and the Second Customer threatened to do the same unless Chefs' Warehouse resolved its labor dispute with Local 1430 by December 7, 2018 (AC ¶ 36). The Court examines Local 1430's conduct with respect to each affected customer to determine whether Chefs' Warehouse has plausibly alleged that Local 1430 violated Section 8(b)(4)(ii)(B).

#### a. First Customer

Chefs' Warehouse has plausibly alleged a claim of unlawful secondary activity by Local 1430 in connection with its conduct with the First Customer. Chefs' Warehouse alleges that Local 1430 threatened to "picket and disrupt" the First Customer's business with a "mob" and an

---

[4] Chefs' Warehouse's claim under 29 U.S.C. § 158(b)(4)(ii) relies solely on Local 1430's alleged violation of § 158(b)(4)(ii)(B). (*See* Dkt. No. 26 at 15–17.) Therefore, the Court need not address potential claims premised on other subsections of § 158(b)(4)(ii).

"inflatable rat." (AC ¶ 32.) As a result, the First Customer terminated its business relationship with Chefs' Warehouse. (AC ¶ 33.)

First, Chefs' Warehouse has sufficiently pleaded that Local 1430's threat to picket was coercive in nature, thus satisfying the first element of Section 8(b)(4)(ii)(B). "Coercive" behavior is that which is confrontational and obstructive, commonly consisting of "carrying . . . picket signs" and "persistent patrolling" in front of secondary worksite entrances to create a "physical or, at least, symbolic confrontation" with those entering the worksite. *See, e.g., In re United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 355 N.L.R.B. 797, 802, 817 (2010) (citing *Mine Workers Dist. Emps. Local 87* (*Trinity Bldg. Maint.*), 312 N.L.R.B. 715, 743 (1993)). In contrast, "informational picketing," *Betal Envtl. Corp. v. Local Union No. 78, Asbestos, Lead & Hazardous Waste Laborers*, 162 F. Supp. 2d 246, 256 (S.D.N.Y. 2001), and appeals to consumers, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 578 (1988), are permissible, non-coercive secondary activities protected by the First Amendment.

The key question is whether Local 1430's alleged threat to picket, in and of itself, is within the type of coercive behavior that is covered by Section 8(b)(4)(ii)(B). The Court holds that threats to picket are coercive in nature if the underlying conduct being threatened is coercive in nature. *See Schwarzbart v. Dist. 65, Nat'l Council of Distributive Workers of Am.*, No. 73 Civ. 5518, 1974 WL 1046, at *5 (S.D.N.Y. Feb. 8, 1974).

Here, Local 1430's threat of a "mob" of union members, alone, may be consistent with an inference of plans to *lawfully* engage in secondary activity, such as a mass distribution of handbills. *See DeBartolo*, 485 U.S. at 571. Similarly, absent specific references to impermissible activity, Local 1430 has a "constitutional right to use an inflatable rat to publicize

13

a labor dispute." *Microtech Contracting Corp. v. Mason Tenders Dist. Council of Greater N.Y.*, 55 F. Supp. 3d 381, 384 (E.D.N.Y. 2014). But viewing in the Plaintiff's favor the threats to picket, to install an inflatable rat, and to appear with a mob, together with a stated intention to "picket and disrupt" the First Customer's business, the Court concludes that it is at least plausible that Local 1430's threatened conduct would reach a level of "physical or, at least, symbolic confrontation," *Local Union No. 1506*, 355 N.L.R.B. at 802, that is prohibited under the statute. Therefore, the Court concludes that Chefs' Warehouse's allegations as to the First Customer satisfy the first element of a Section 8(b)(4)(ii)(B) claim.

Second, Chefs' Warehouse has sufficiently pleaded that Local 1430 had an improper motive, satisfying the second element of the statute. Chefs' Warehouse argues that Local 1430 made the threats to "exert[] economic pressure on [its customers] in order to induce them to stop doing business with Chefs' Warehouse." (Dkt. No. 26 at 17.) In response, Defendants counter that Local 1430 has not made a quid pro quo threat directing the customers to stop doing business with Chefs' Warehouse. (Dkt. No. 27 at 5.) However, the complaint explicitly alleges that on several occasions Local 1430 asked the customers to cease their business relationships with the Chefs' Warehouse. (*See, e.g.*, AC ¶¶ 38, 44, 45.) Indeed, the First Customer terminated its business relationship with the Chefs' Warehouse because of Local 1430's threats. (AC ¶ 6.) As these threats are part of "an orchestrated and concerted campaign," it is at least plausible that Local 1430's motive was to induce the customers to stop doing business with Chefs' Warehouse. (AC ¶ 4.) Therefore, Chefs' Warehouse also satisfies the second element of Section 8(b)(4)(ii)(B).

Third, Chefs' Warehouse also plausibly alleges that there is a "causal nexus between the unlawful secondary activity and the injury suffered by the plaintiff." *C&D Restoration*, 2004

14

WL 736915, at *4. The First Customer allegedly terminated its business relationship with Chefs' Warehouse "as a result of th[e] threat by" Local 1430. (AC ¶ 32.) Thus, Chefs' Warehouse has asserted a claim of unlawful secondary activity based on Local 1430's threat to the First Customer.

### b. Second, Fourth and Fifth Customers

Chefs' Warehouse alleges that Local 1430 threatened "to put a giant inflatable rat" in front of the Second Customer's place of business "in order to disrupt a major corporate event that was scheduled to take place." (AC ¶ 34.) Similarly, Local 1430 allegedly threatened to erect giant rats at the Fourth and Fifth Customers' places of business. (AC ¶ 38.) These claims, however, fail to allege sufficient facts to permit a reasonable inference that Local 1430's conduct was coercive.

As noted above, installing a giant inflatable rat outside a business entrance is permissible secondary activity; it becomes impermissible only if the rat impedes travel or is erected in the context of "confrontational conduct" with the secondary party. *W2005 Wyn Hotels, L.P. v. Abestos, Lead & Hazardous Waste Laborers' Local 78*, No. 11 Civ. 1249, 2012 WL 955504, at *3 (S.D.N.Y. Mar. 8, 2012). Absent any specific threats to use an inflatable rat to engage in "confrontational conduct," however, Local 1430's threat to erect an inflatable rat should be presumed lawful. *See N.L.R.B. v. Servette, Inc.*, 377 U.S. 46, 57 (1964). Although Chefs' Warehouse alleges that the threat was intended to "disrupt," the absence of any stated threats to gather a "mob" or to "picket" makes the threats aimed at the Second, Fourth, and Fifth Customers less confrontational than the threat aimed at the First Customer. Because Chefs' Warehouse does not satisfy the first element of a Section 8(b)(4)(ii)(B) claim, its claim premised on Local 1430's threats to the Second, Fourth, and Fifth Customers must be dismissed.

### c. Third Customer

Chefs' Warehouse also alleges that Local 1430 threatened to send a mob to protest at the Third Customer's place of business. (AC ¶ 37.) This claim fails, however, because threatening to send a mob to protest is not coercive in nature *per se*. As discussed above, Local 1430's threat of a "mob" of union members, alone, does not indicate that its protest would be carried out in a coercive manner. Local 1430 contends that it intended only to "notify[] the public," rather than obstructing the Third Customer from conducting business. (Dkt. No. 23 at 2.) Absent factual allegations that lead to the inference that Local 1430's threatened protest would be coercive, the Court concludes that Chefs' Warehouse' claim premised upon Local 1430's threat to the Third Customer must be dismissed.

### C. Defamation Claim

Chefs' Warehouse asserts a defamation claim against Wiley because Wiley has accused Chefs' Warehouse of supporting racist business practice and firing employees arbitrarily. (AC ¶¶ 79–89.) Chefs' Warehouse and Defendants disagree as to whether the NLRA preempts the defamation claim such that it should be dismissed. (Dkt. No. 23 at 9–13; Dkt. No. 26 at 17–20.)

It is well settled that state-law claims are preempted to the extent that they cover "activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Healthcare Ass'n of N.Y.S., Inc. v. Pataki*, 471 F.3d 87, 95 (2d Cir. 2006) (quoting *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286 (1986)); *see also San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 244–46 (1959). But federal law does not preempt state-law claims if they are premised on activity that was "a merely peripheral concern of the Labor Management Relations Act," or "touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [the Court] could not infer that Congress had deprived the States of the power to act." *Garmon*, 359 U.S. at

243–44. The Supreme Court has held that defamation claims alleging actual malice are not preempted, because such claims were "merely peripheral concern of the Labor Management Relations Act." *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 61 (1966). Accordingly, the Court will consider whether Plaintiff's defamation claim adequately alleges actual malice so as to avoid preemption.

A statement is made with actual malice if it was "issued with knowledge of its falsity, or with reckless disregard of whether it was true o[r] false." *Id.*; *see N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). At the motion-to-dismiss stage, a plaintiff must plead "'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (quoting *Twombly*, 550 U.S. at 556 (2007)) (alteration in original). Here, Chefs' Warehouse alleges that Wiley sent an email to the Barclays Center accusing Chefs' Warehouse of having "a policy of supporting racist business practices, firing their employees arbitrarily, and not honoring their union contract." (AC ¶ 80.) Wiley also allegedly made similar accusations on the social media pages of Chefs' Warehouse and its customers. (AC ¶¶ 81–84.) For example, Wiley tagged the Second Customer in a Facebook post stating that Chefs' Warehouse "has a history of abusing their employees, supporting racist business practices, and even attempting to cover up how one of their warehouse employees died." (AC ¶ 83.)

Accepting all the factual allegations as true and drawing all inferences in favor of Chefs' Warehouse, the Court concludes that it has plausibly alleged a defamation claim with actual malice. First, Chefs' Warehouse has alleged that it has never supported any racist business practice. (AC ¶ 85.) Defendants, on the other hand, assert that Wiley's accusation of Chefs' Warehouse's racist practice is supported by the fact that Chefs' Warehouse failed to address the

Incident on November 28, 2018. (Dkt. No. 23 at 12.) However, it is unclear if a single incident would entitle Wiley to believe and state that Chefs' Warehouse had a "policy" or a "history" of "supporting racist business practices." (AC ¶¶ 80, 83.) Assuming that Chefs' Warehouse's allegations are true, it is plausible that Wiley — who presumably would have known about Chefs' Warehouse's business practices as the Business Agent for Local 1430 — acted maliciously when making allegedly false statements about Chefs' Warehouse's "policy" or a "history" of "supporting racist business practices." (*Id.*)

Similarly, Chefs' Warehouse has pleaded a plausible claim that Wiley acted with actual malice when stating that Chefs' Warehouse had a policy of "firing their employees arbitrarily, and not honoring their union contract," or that it attempted to cover up how one of their employees died. (AC ¶¶ 80, 83–84.) Defendants seek to introduce an affidavit by Wiley and several exhibits to show that Wiley did not act maliciously. (Dkt. No. 23 at 13; Dkt. No. 27 at 11–12; *see* Dkt. No. 24.) However, the Court may not consider this evidence at the motion-to-dismiss stage where Chefs' Warehouse lacked notice of the materials to be considered.[5] *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Taking as true Chefs' Warehouse's allegations that it does not fire its employees arbitrarily, honors the CBA, and does not treat its employees poorly, the Court concludes that there is a plausible claim that Wiley either knew, or recklessly disregarded the alleged falsity of his statements given his position as the Business Agent of Local 1430.

---

[5] Defendants urge the Court to treat this motion as one for summary judgment and consider Wiley's affidavit and its exhibits in deciding this motion, pursuant to Federal Rule of Civil Procedure 12(d). (Dkt. No. 27 at 10–12.) The Court declines to do so, because Chefs' Warehouse has not conducted discovery and been "given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Snyder v. Fantasy Interactive, Inc.*, No. 11 Civ. 3593, 2012 WL 569185, at *2 (S.D.N.Y. Feb. 9, 2012).

Of course, discovery may well turn up evidence showing that Wiley had personal knowledge to believe, or at least had reasons not to doubt, the truthfulness of his statements. But such evidence should be introduced and assessed at the motion-for-summary-judgment stage rather than motion-to-dismiss stage. Because Chefs' Warehouse has pleaded a plausible defamation claim alleging actual malice, its claim is not preempted and should not be dismissed. *See Jung Sun Laundry Grp. Corp. v. Laundry, Dry Cleaning, & Allied Workers Joint Bd.*, No. 10 Civ. 468, 2010 WL 4457135, at *6 (S.D.N.Y. Nov. 1, 2010) (refusing to dismiss a defamation claim brought by an employer against a labor union because the employer has pleaded malice).

### D.　Injunctive Relief

Finally, Defendants seek dismissal of Chefs' Warehouse's request for injunctive relief if the Court dismisses Chefs' Warehouse's other claims. (Dkt. No. 23 at 18.) Because Chefs' Warehouse's claims partially survive the motion to dismiss, this request is denied.

## IV.　Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

The Clerk of Court is directed to close the motions at Docket Numbers 13 and 22. Defendants shall answer the amended complaint within 21 days after the date of this opinion and order.

　　SO ORDERED.

Dated: September 24, 2019
　　　　New York, New York

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　J. PAUL OETKEN
　　　　　　　　　　　　　　　　　　United States District Judge

19